## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Scott Dahlstrom, Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, do depose and state under penalty of perjury that the following is true to the best of my information, knowledge and belief.

1. I am a Special Agent with the FBI, and have been since 2009. I am currently assigned to the Denver Division of the FBI, and specifically to the National Security, Domestic Terrorism squad. I investigate domestic terrorism matters in the normal course of my duties, and I am fully familiar with the facts of the case. I have led and assisted in investigations of federal criminal violations related to violent crimes, drug investigations, financial crimes, and international and domestic terrorism.

2. This affidavit is submitted in support of an application for a search warrant for the place described in Attachment A (hereinafter "Subject Premises,"), and the computer(s) located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 842(a)(1) (Manufacturing or dealing in explosive material without a license) and 26 U.S.C. §§ 5841, 5861(d), and 5871 (Possessing Unregistered Firearms).

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 842(a)(1) (Manufacturing or dealing in explosive material without a license) and 26 U.S.C. §§ 5841, 5861(d), and 5871 (Possessing Unregistered Firearms) are presently located at the Subject Premises.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

### TECHNICAL TERMS

5. Based on my training and experience, I use the following technical terms to convey the following meanings:

6. "IP Address" means Internet Protocol address, which is a unique numeric address used by computers on the Internet. Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

7. "Internet" means a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

8. In this affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

### SEIZURE AND SEARCH OF COMPUTERS

9. As described above and in Attachment B, I submit that if computers or storage media are found at the Subject Premises, there is probable cause to search and seize those items for the reasons stated below. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis. They may be seized and searched on-scene, and/or searched off-scene in a controlled environment.

10. For example, based on my knowledge, training, and experience, I know that a powered-on computer maintains volatile data. Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks (floppy, tape and/or CD-ROM), and printing activity. Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed. Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

11. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

12. Also, again based on my training and experience, wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, virtual memory "swap" or paging files, and shadow copies of previous versions of systems or files, or paging files. Computer users typically do not erase or delete this evidence because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted, edited, moved, or show a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

13. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, why they were used, the purpose of their use, and the purposes to which they were put, who used them, the state of mind of the user(s), and when they were used.

14. The monitor and printer are also essential to show the nature and quality of the images or files that the system can produce. In addition, the analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

15. The computer and its storage devices, the mouse, the monitor, keyboard, printer, modem and other system components are also used as instrumentalities of the crime to operate the computer to commit the offenses discussed in this affidavit. Devices such as modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet or to otherwise commit the crimes described herein. The computer equipment may also have fingerprints on them indicating the user of the computer and its components.

16. Similarly, information or files related to the crimes described herein are often obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files. Files

4

that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

17. "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

18. I know from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

19. Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use a multitude of techniques, both on and off-scene, including more thorough techniques.

20. Based upon my knowledge, training and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques that often includes both on-site seizure and search as well as a more thorough review off-site review in a controlled environment. This variety of techniques is required, and often agents must

seize most or all storage media to be searched on-scene and/or later in a controlled environment. These techniques are often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

21. For example, the search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following on-site techniques (the following is a non-exclusive list, as other on-site search procedures may be used):

    a. On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

    b. On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when, and may contain information about encryption, virtual machine software (virtual operating systems that are lost if the computer is powered down or encrypted),;

    c. On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for any examination.

22. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include off-site techniques since it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment. This is true because of the following:

    a. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how, when and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis. Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal

      activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of child exploitation offenses).

b. The volume of evidence and time required for an examination. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

e. Need to review evidence over time and to maintain entirety of evidence. Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into

a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

23. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site seizing, imaging and searching and off-site imaging and searching of storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

24. Because several people may share the Subject Premises as a residence, it is possible that the Subject Premises will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

25. I know from training and experience that digital storage devices can be very large in capacity, yet very small in physical size. Additionally, your Affiant knows from training and experience that those who are in possession of such devices also tend to keep them

8

      on their persons, especially when they may contain contraband or other evidence of a crime. The storage capacity of such devices can be as large as tens of gigabytes in size as further described below, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs and text documents. Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket.

26. I know from training and experience that search warrants of residences involved in computer or digitally related criminal activity usually produce items that tend to establish ownership or use of digital devices and ownership or use of any Internet service accounts accessed to commit the crimes described in this affidavit to include credit card bills, telephone bills, correspondence and other identification documents.

27. I know from training and experience that search warrants of residences usually reveal items that tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

## INVESTIGATION

28. The FBI began investigating Kyle Schneider on September 12, 2019, after a Confidential Human Source ("CHS") reported that Schneider is building and selling grenades. Schneider resides at the Subject Premises.

29. The CHS was an informal CHS for a local police department when s/he initially reported information about Schneider. The CHS has previously reported to local law enforcement on matters which are not in the public domain and have been corroborated. After the information on Schneider was received, the FBI began working officially with the CHS and opened him/her as an FBI CHS. The CHS has a felony criminal history and has been convicted of Assaults and Drug Offenses. The CHS is a known drug user. The CHS has not received any benefit from the FBI for his/her reporting. The CHS has requested benefits of child custody but no promises have been made.

30. According to the CHS, on or about August 21, 2019, the CHS met with Schneider for the first time while with an individual hereinafter known as Witness1 and a relative of Witness1.[1] All three were in the CHS's vehicle and stopped by Schneider's residence (the Subject Premises). Schneider came out of the residence to the car and talked to the relative and gave him what looked like a clump of gray molding clay. They left the residence and the relative stated it was C-4. The clump had a sulfur smell and left gray residue on the CHS's hands. The CHS friended Schneider on Facebook shortly thereafter.

---

[1] Witness1 was being developed by the FBI to be a Confidential Human Source prior to the investigation but was ultimately not opened as a CHS because FBI was unable to obtain approval from Witness1's parole officer. Witness1 was not complying with terms of parole. Witness1 is a registered sex offender.

9

31. The CHS identified Schneider's Facebook account (user ID number 100037296556102, username Ky Sch). I have reviewed Schneider's public Facebook profile, which includes one photograph of an individual who appears to be Schneider with the barrel of what appears to be a shotgun lying next to him. The photograph also shows a partial view of the grip of another unknown firearm. This photograph was uploaded on August 1, 2019.

32. After meeting Schneider, the CHS communicated with Schneider through Facebook and personal visits to the Subject Premises. According to the CHS, on or about August 24, 2019, Schneider asked the CHS in person to purchase materials in order for Schneider to make explosives. Schneider gave a list of items on a piece of paper but Witness1 lost the paper. On or about August 28, 2019, the CHS repeated numerous ingredients to Schneider, through Facebook, that he had asked the CHS to purchase. I have reviewed Facebook messages between the CHS and Schneider, as provided by the CHS. On or about August 28, 2019, the following exchange happened between the CHS and Schneider:

> CHS: "Hey can you send me the list of shit I need to buy. [Witness1] must have three it away."
> CHS: "Threw"
> CHS: "I want to get everything right"
> . . .
>
> CHS: "My friend is at the store picking this shit up for me and is getting mad at me"
> CHS: "I remember vasaline, potassium nitrate, wax, distilled water, hydrometer, and bleach."
> CHS: "Am I missing anything"
> Schneider: "My bad we're getting about three done today I had to go help bring some shit in we need whit camping fuel potassium chloride bleach".
> CHS: "Because we have the Dest?"
> CHS: "Rest? Fucking type correct. I will see if I can drop it off"
> Schneider: "I mentioned getting the bathroom redone"
> Schneider: "I mean ment not mentioned stupid phone"
> CHS: "Its that military friend I told you about. He was giving out secrets and took something he should not have so he got booted lol"

33. On or about August 29, 2019, the CHS reported that Schneider asked the CHS to "go smoke" with him through a text message. The CHS explained that s/he understood Schneider to be referring to methamphetamine, as the CHS has known Schneider to use that particular drug.

34. The CHS reported that s/he has been to the Subject Premises on numerous occasions. On or about September 11, 2019, the CHS reported visiting Schneider's residence with Witness1. The CHS reported that during that visit, Witness1 took pictures of what appeared to be a grenade using the CHS's telephone. According to the CHS, Schneider

    offered to sell the grenade to the CHS for $800.  Witness1 also took photographs of ingredients and instructions listed on a piece of paper that included a reference to the "Anarchist Cookbook."  The CHS provided these photographs to the FBI.  The CHS also reported that Schneider claimed to be selling 16 of the grenades to the Hells Angel's Motorcycle Club and explained that he buys empty grenade casings from local army supply stores and fills them with the explosives.  Witness1 stated to the FBI, in the presence of the CHS, that Schneider kept the destructive devices at a location other than the Subject Premises.

35.    FBI bomb technicians have reviewed the photographs provided by the CHS showing ingredients and instructions on how to mix those ingredients.  Based on that review, the list appears to depict real instructions on how to make a destructive device.

36.    I have reviewed the photographs provided by the CHS.  The photograph of the device the CHS says Schneider offered to sell appears to show a destructive device with a grenade shell similar to an M67 grenade.  The shell is gray in color and had been scored on the outside. Scoring the outside of a destructive device may create more shrapnel upon detonation.

37.    Surveillance was initiated by the FBI on the Subject Premises on September 16, 2019.  Based on that surveillance, Schneider appears to spend the majority of his time at the Subject Premises and moves frequently between a shed on the property and the main residence.  Surveillance never observed Schneider to drive a vehicle, but he did occasionally walk to meet people in person or to get rides from unknown individuals.

38.    On September 23, 2019, the CHS went to the Subject Premises at the direction of the FBI. The CHS went to a shed on the property and saw Schneider in possession of another grenade similar to the one shown in the photograph provided by the CHS.  The CHS was unsure if it was the same device. According to the CHS, Schneider stated he has made additional grenades and has distributed them. Schneider brought the grenade to the shed from the main residence.  The CHS also reported seeing a bucket in the shed that contained what s/he described as "crystals" and smelled of a strong odor of bleach and fuel.  The CHS stated this was produced by following the directions written on the paper previously photographed and given to the FBI.  Bleach and gasoline are listed as ingredients for making explosives on the instructions previously provided to the FBI.  The CHS says that s/he has observed the bucket of "crystals" on prior visits to the Subject Premises.  Each time, the bucket of crystals has depleted in amount. According to the instructions provided by the CHS, the crystals are potassium chloride and can be ground into a powder for further mixing for explosive making.

39.    On or about September 24, 2019, the CHS sent a picture to the FBI of a five dollar bill and stated s/he watched Schneider make that bill on a printer and it appeared Schneider was attempting to produce counterfeit United States currency.

40.    On September 30, 2019 during surveillance, Schneider was observed leaving the Subject Premises on foot while using his cellular telephone. Schneider was also observed taking a

plastic bag out of his pocket. Schneider then met an unknown male close to the Subject Premises for approximately 15 minutes. Schneider then ran hurriedly back to the Subject Premises.

41. On or about October 2, 2019, Witness1 was arrested for parole violations. The CHS was present and was also arrested for attempted influence of a public official by telling them his/her status as an FBI CHS.

42. After the arrest, Witness1 stated s/he lied about Schneider keeping the destructive devices at a location other than the Subject Premises. Witness1 stated s/he lied in order to delay and hopefully gain a benefit from the FBI. Witness1 told family members about the CHS's involvement with Schneider and reporting to the FBI. Witness1 told the family members that if s/he were ever arrested, it would be the CHS's fault and to let people know that the CHS was working with the FBI. When Witness1 and the CHS were arrested, the family members let other unknown individuals know about the CHS and flyers were posted around Commerce City letting people know that the CHS was working with the FBI. Schneider became aware of this information and asked the CHS to never contact him again. According to the CHS, Witness1 was jealous of the relationship the CHS and Schneider had.

43. On October 11, 2019, the FBI collected trash from the curb of the Subject Premises. The trash contained a gallon size Ziploc bag that had trace amounts of a white substance. This substance field tested positive for methamphetamine. Also found in the trash was a shotgun shell that was not fired but split open with the contents removed and a color photocopy of the front and back of a 50 dollar bill.

44. On October 18, 2019, the FBI collected trash from the curb of the Subject Premises. The trash contained one empty 2.5 gallon container of kerosene fuel. Kerosene is a common fuel used to produce heat. According to the ingredients and instructions for explosives produced by the CHS, a reliable heat source is needed to heat and produce the explosive mixture. Also found were two shotgun shells that were not fired but split open with the contents removed and three smaller pieces of shotgun shells that appeared to be cut as well. Finally, over 100 partial brown glass pipes, approximately three to five inches in length, were found. These pipes were covered in white residue. These types of pipes are commonly used to smoke drugs, particularly methamphetamine. The pipes appeared to all be broken in the same location where a bulb would be located. The bulb is where the drugs would be placed and then heated in order to be consumed by the user.

45. According to the Bureau of Alcohol, Tobacco, and Firearms (ATF), a license check was performed on Schneider and it was shown that Schneider does not possess a license to manufacture, deal, possess, or import explosives. Schneider is also not registered in the National Firearms Act database as having registered destructive devices.

46. According to the CHS, Schneider has a desktop and/or laptop and a computer tablet located in his room. Due to Schneider's active use of the internet to access Facebook, I submit that it is reasonable to believe that Schneider uses computers, telephones, and/or

computer tablets to communicate with others about his activities in assembling destructive devices. It is also reasonable to believe that Schneider uses these same devices for online purchasing of items used in the assembling of destructive devices and looking up instructions on how to assemble said devices.

### REQUEST FOR AUTHORIZATION TO EXECUTE WARRANT WITHOUT KNOCK AND ANNOUNCING PRESENCE OF OFFICERS

47. I submit that there is reasonable, articulable suspicion that knocking and announcing would lead to violent action by Kyle Schneider. As discussed above there is probable cause to believe that Kyle Schneider is residing at the Subject Premises – and that Kyle Schneider is knowledgeable in manufacturing explosives. Accordingly, there is reasonable, articulable suspicion to believe that Kyle Schneider is in possession of explosives and may use explosives in an attempt to flee or cause harm to law enforcement officers executing the search warrant. Accordingly, I request permission to execute this search warrant without knocking and announcing the presence of law enforcement officers.

### CONCLUSION

48. Based on the investigation described above, probable cause exists to believe that at the residence located at the place described in Attachment A, will be found evidence, fruits, and instrumentalities of a violation of 18 U.S.C. § 842(a)(1) (Manufacturing or dealing in explosive material without a license) and 26 U.S.C. §§ 5841, 5861(d), and 5871 (Possessing Unregistered Firearms) (described on Attachment B).

49. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

*s/Scott Dahlstrom*
Scott Dahlstrom, Special Agent
Federal Bureau of Investigation

Submitted, attested to, and acknowledged by reliable electronic means on October __24th__, 2019.

UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

**This Application and Affidavit was reviewed and submitted by Assistant United States Attorney Julia Martinez.**